Thomas Monaghan, ISB #7675
Thomas Monaghan Law, PLLC
409 S. 8th St. – Room 205
Boise, Idaho  83702
(208) 813-4766
tom@gtmonaghanlaw.com

Attorney for Defendant
CHRISTOPHER MICHAEL HAYMAN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

(HONORABLE AMANDA K. BRAILSFORD)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs<br><br>CHRISTOPHER MICHAEL HAYMAN,<br><br>Defendant. | Case No: 1:24-cr-000224-AKB<br><br>**SENTENCING MEMORANDUM** |

TO:    BART MCKAY DAVIS, UNITED STATES ATTORNEY
        KELSEY MANWEILER, ASSISTANT UNITED STATES ATTORNEY
        RYAN LESMEISTER – UNITED STATES PROBATION OFFICER

Christopher Hayman, through his counsel, hereby submits this sentencing

memorandum, in which he requests the Court impose a term of imprisonment of 21

months followed by three (3) years of supervised release. Although this proposed

sentence would be a variance from the advisory Guideline range calculated by the

presentence report, the Sentencing Guidelines have not taken into account the

unique mitigating factors presented in this case, including a recently obtained

**Sentencing Memorandum -- 1**

psychological evaluation conducted by Linda Hatzenbuehler. Considered in combination, those factors establish that the defense's proposed sentence would be "sufficient, but not greater than necessary" to address the goals and requirements of 18 U.S.C. § 3553.

## Pending Objections to the Presentence Report

There are pending objections to the presentence report that will require the Court's resolution. Those were filed in Mr. Hayman's Response to Presentence Report on October 24, 2025. [Dkt 42]. The presentence report addendum addressed those objections but deferred to the Court with respect to the defense's objection to the Court's consideration of uncharged conduct in the sentencing process. The addendum also did not agree with the defense's objection to the 3-level enhancement applied pursuant to U.S.S.G. § 2K2.1(b)(4)(B)(ii) for possessing a firearm without a serial number. The defense respectfully incorporates the arguments presented in the Response to Presentence Report on these issues and requests the Court address them at the time of the sentencing hearing.

The defense's position is that the proper Sentencing Guideline range would be 46-57 months that would apply without this enhancement. This range is thus based on a Criminal History Category I and an offense level of 23. It bears noting that the plea agreement contains the government's stipulation that it will not seek a sentence greater than 46 months – the low end of this corrected range.

**Sentencing Memorandum -- 2**

**18 U.S.C. § 3553**

With the advent of <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme issued a series of decisions that "empowered district courts, not appellate courts …. [and] breathe[d]  life into the authority of district court judges to engage in individualized sentencing …." <u>United States v. Whitehead</u>, 532 F.3d 991 (9th Cir. 2008) (citation omitted).  Because the Guidelines must be considered as the starting point for the Court's consideration in the sentencing process, when a defendant seeks a downward variance, they can appear to take on greater significance than the other 3553 factors.  However, the Supreme Court has emphasized that the Guidelines are merely one factor among the other 3553 factors, and they are not to be accorded any greater weight than the other considerations set forth in the statute.

These principles, while fundamental to federal sentencing, bear mentioning because this is a case where the Sentencing Guidelines provide for an advisory range that would be unreasonable, unjust, and unnecessary in light of Chris's unique background.  That background provides important mitigating context to the circumstances of Chris's criminal conduct and illustrates why a variance below the purely advisory Guideline range is appropriate.

A.    **History and characteristics of Christopher Hayman**

At 39 years of age, Christopher Hayman cuts a striking figure – as a six foot five, 285-pound muscular United States Marine Corps combat veteran, it is difficult to envision Chris as vulnerable.  Despite his size and stature, however, Chris has

Sentencing Memorandum -- 3

experienced enormous trauma that began in early childhood and was compounded by his active service during combat operations as a Marine in Iraq. These traumatic experiences have had an indelible impact on his psyche, resulting in diagnosed mental disorders and manifesting in poor judgment, correlated legal problems and troubled personal relationships. Although his history warrants consideration from the Court in determining the appropriate sentence, the good news is that Chris is highly motivated to obtain treatment that will help him address and cope with the lingering effects of his trauma.

Chris's exposure to chronic trauma began when he was just a young boy, but its effects continue to impact him many years later. Rather than being the product of his own voluntary choices, Chris had no control over either the frequent emotional and physical abuse that he suffered as a child or its ongoing aftermath. Fortunately, Chris recognizes he needs help; he is highly motivated to participate in treatment that can address the symptoms from his mental health disorders and assist him with the difficulties he has maintaining relationships with romantic partners.

### 1. <u>Early Childhood</u>

Beginning when he was just a little boy, Chris's home was marked by dysfunction and instability. When Chris was only three years old, his mother and father divorced after his father had an affair. Chris stayed with his mother during the majority of his childhood, although he continued to have contact with his father.

Things took a turn for the worse in his household, however, when Chris's

**Sentencing Memorandum -- 4**

mother, Donna Schmid, married Bryce Hatch roughly six months after his parents' divorce.  Bryce had a hair-trigger temper that made him quick to anger and prone to violent physical abuse of Chris, his siblings, and his mother.

Chris's young age did not render him immune from Bryce's abuse. He provides a harrowing account of the first time he was subjected to Bryce's violence:

> My very first memory of Bryce was we had dinner at his house, my mom brought my brother and I there. My brother was 6, I was 4 almost 5, and I walked around in his house and I knocked over a succulent plant that was next to the spare bedroom bed. I remember it was the first time I had seen aggression in my life, I remember hiding underneath the bed, I remember him dragging me out and slapping the shit out of me. And it was just anger and complete violence.

Bryce's abuse would only grow more intense and frequent over time.  He would also force Chris and his brother to attend to him in humiliating and degrading ways, such as making them rub his feet while he sat on the couch in his underwear.

Although Bryce's abuse extended to everyone in the home, Chris received the brunt of it.  This is because Chris would often try to intervene on behalf of his siblings when Bryce would focus his rage on them.  Bryce's acts of violence towards Chris include throwing a steel-toed boot and bottles at Chris's head, throwing him down a flight of stairs, and holding knives up to Chris's ears while telling him he would cut them off if Chris did not listen.

On one occasion, Chris recalls Bryce came home drunk from the bar and began playing with Chris's infant sister, Paige. His baby sister began crying when Bryce began "playing too rough."  Chris, who was roughly 14 years old at this point, told

**Sentencing Memorandum -- 5**

Bryce he would take her.  Bryce became enraged when Chris was holding Paige, so Chris put her down safely on a couch as Bryce directed his anger at him. His stepfather became belligerent, screaming at Chris and chasing him into a home office where he began beating him.  Chris ultimately had to take his baby sister and run to a neighbor's house for help.

Another episode that Chris vividly recalls occurred when Chris's brother accidentally knocked a baseball off of a shelf.  Bryce, who had been sleeping because he had to wake up for work the next day, immediately rushed downstairs and began beating Chris's brother.  Chris tried to punch Bryce in a valiant, but futile, attempt to protect his brother.  However, because Chris was still very young, Bryce easily deflected his blows.

Chris not only experienced developmental trauma from Bryce's physical and mental abuse directly, he had to endure the trauma of witnessing his stepfather's physical and mental abuse towards his mother and brother.  Additionally, Chris's relationship with his mother suffered during this time because he harbored resentment towards her for turning a blind eye to Bryce's abuse of him and his siblings.  His mother completed her education while Chris was a child, which meant that she was rarely around for much of Bryce's abusive behavior; when she was present, she did nothing to curb his violence and rage.

Chris has observed that while the physical abuse inflicted by Bryce was extremely painful, his mother's tacit condoning of Bryce's treatment of Chris and his

**Sentencing Memorandum -- 6**

siblings hurt him even more, as it lingered longer than any physical pain and caused him to feel isolated and alone.  Nevertheless, Chris has forgiven his mother, and their relationship is far better now.

While it is difficult to envision how toxic Bryce's abuse made Chris's home environment during his childhood, there is significant evidence corroborating Chris's description of Bryce's monstrous violence. Attached to this memorandum are records from a criminal case brought against Bryce in 2000 in Kootenai County for misdemeanor injury to child.  The complaint for the offense charged that when Chris was 13 years old, Bryce caused him to suffer "by hitting him in the jaw and/or ribs with a closed fist…."  Exhibit A, p. 2.  Unfortunately, the charge was ultimately dismissed pursuant to what appears to be some agreement by the prosecutor and Bryce's defense attorney.

The defense has obtained Chris' voluminous medical records from the Boise Veteran's Administration Medical Center, where he has received treatment in the past for PTSD, major depressive disorder, anxiety, ADHD, and a traumatic brain injury.  See Presentence Report, pp. 11-12, para. 55-56.  A March 19, 2015 entry in the VA records reflects Chris's receipt of EMDR therapy[1] at the VA Medical Center:

---

[1] EMDR stands for Eye Movement Desensitization and Reprocessing therapy, which is a psychotherapy designed to alleviate distress associated with patients' traumatic experiences.  The idea is that traumatic memories, when not properly processed by the individual's mind, can become "stuck" in the brain  The treatment involves having patients access memories of past trauma while they engage in eye movements to stimulate bilateral brain activity that enables them to reprocess the traumatic memories more adaptively instead of "reliving the event," which leads to

**Sentencing Memorandum -- 7**

> SUMMARY OF THERAPEUTIC SESSION: Addressed treatment goals #1 and #2.
> Continued EMDR on memories of childhood  physical abuse from step father ages
> 6-15. Veteran reported distress on specific memory of physical abuse continued
> to decrease. Building on last session where distress was down from 9 - 4, after
> this session, specific memory of being beaten was down from 4 - 2. Also talked
> about trouble sleeping.

These records clearly show that Chris disclosed to his treatment providers the abuse that he suffered at the hands of his stepfather in 2015 – conclusively dispelling any theory that he is exaggerating his condition in some attempt to obtain a lower sentence from the Court.  The entry powerfully illustrates how the impact of his stepfather's abhorrent physical and mental abuse continues to affect him decades later in adulthood.

Chris's mother, Donna Schmid, acknowledged during her interview by Dr. Linda Hatzenbuehler in connection with the psychological evaluation of her son that Bryce physically abused him.  See Exhibit B.  Her attempt to minimize her husband's abuse of Chris should be taken with a grain of salt as they are likely attributable to her guilt over her failure to protect her son.

### 2.    Military Service

Chris went into the military directly after high school, enlisting in the United States Marine Corps, serving his country on active duty for four (4) years.  During his active service between 2005-2009, Chris served three tours in Iraq during the United States' war with and occupation of that country.

Chris served with distinction, receiving an honorable discharge in 2009, after

---

emotional and psychological difficulties.  See https://www.emdr.com/what-is-emdr/

**Sentencing Memorandum -- 8**



he completed his term of required active service. Exhibit C (DD-214). However, his service came with a heavy price: the developmental trauma that he suffered from Bryce's physical and mental abuse was compounded by the trauma that he experienced during his service in the Marines during combat operations in Iraq. See Exhibit B, p. 2.

The photograph to the left was taken when Chris was selected to be on a special episode of the Jimmy Kimmel Show in November 2008 designed to honor and support those troops who were deployed overseas. Chris was chosen as one of the spotlighted Marines on the show based on his standout performance. Staff Sergeant Gabriel Jaggi praised Chris's work ethic as deserving of the honor: "Sgt. Hayman puts out the extra effort even when [he doesn't have to], and I figured he needed a little humor in his life. … He's a good Marine and he does his job well, so why not let him enjoy a little bit of [fun]." Exhibit D (article re Jimmy Kimmel show).

While this lighthearted event was a welcome distraction from the sobering hostilities, Chris's service affected him profoundly. He describes the hypervigilance he experienced during his time in a combat zone: "I used to sleep in Iraq with a

**Sentencing Memorandum -- 9**

weapon next to my bed,  Next to my bed became under the pillow, under the pillow became in my hands.  We were bombed every day."  Chris also struggled with enormous grief and guilt when his fellow Marines were lost – some to combat operations during his first deployment and some who tragically succumbed to the trauma and took their own lives.

As with many veterans who return home after combat experience, Chris has suffered from PTSD and its debilitating symptoms.  His sister, Paige, with whom he has a very close bond expresses her opinion regarding the effects that serving overseas in combat operations had on him:





"I have not always agreed with some of his choices, as he obviously has made some very poor ones.  I think this is in part because he always wants to be the yes man, and be everything for everyone.  In doing this, he seems to have lost his sense of self and abandoned his character.  I also believe that he has some very real and untreated depression after his time in the service, and I think society convinced him to "man up" instead of getting the help he needed to process the things he saw and went through during his tours overseas.  I don't want to make excuses for him by any means, but I believe America has truly failed our veterans when it comes to post war resources and treatments.  I also think the world of social media, and who he was choosing to surround himself with severely eroded his judgement.  I believe all of these things together led to his actions that have landed him here."

Exhibit E, p. 1 (support letters).  His mother, Donna, makes similar observations:

**Sentencing Memorandum -- 10**

Christopher's time in the military has profoundly shaped who he is. The experiences he faced during the war have impacted him significantly, and I believe he may be struggling with underlying issues related to PTSD. As a Clinical Psychologist, who also wears the "hat" of his mother, it has been difficult to watch some of his unresolved PTSD issues and the negative impact they have had on his life. It is important to acknowledge that the stress and trauma he encountered can manifest in various ways, affecting his emotional and physical well being as well as his decision-making. While this does not excuse his actions, it provides context for the struggles he has faced since his service. I believe with the right support and resources, he can begin to address these challenges and work towards healing.

Exhibit E, p. 2. The observations of his family members have been confirmed through Chris's diagnosed PTSD, which is the subject of many of his VA medical records. Those records describe at length the symptoms he began having while still serving in his first deployment. Those have included anxiety, irritability, and recurring nightmares of being back in combat.

The effects of his childhood and battlefield traumas have caused Chris to seek out treatment with the VA to address the symptoms produced. The VA has determined that the severity of Chris's conditions render him 92% disabled. His diagnosed PTSD has been calculated as accounting for 70% of the disability rating.

### 3. Psychological Evaluation

Attached to this memorandum is an evaluation of Chris conducted by Dr. Linda Hatzenbuehler, a psychologist who has provided forensic opinions in criminal cases for many years in state and federal court. Dr. Hatzenbuehler diagnosed Chris as continuing to suffer from PTSD, unspecified mood disorder with depressive traits, substance abuse disorder, and unspecified personality disorder with narcissistic

**Sentencing Memorandum -- 11**

traits.  Exhibit B, pp. 1-2.

Importantly, Dr. Hatzenbuehler observes that Chris's "current patterns of behavior are likely to have been impacted by his history of developmental traumas." Exhibit B, p. 2.  Those are events in childhood where the child is subjected to mistreatment or abuse.  In Chris's case, Dr. Hatzenbuehler opines that Chris's developmental traumas "may have hindered his ability to form secure bonds and to receive emotional nurturing."  Exhibit B, p. 2. Dr. Hatzenbuehler further concludes that the trauma Chris experienced in his military deployments compounded further the developmental traumas experienced during his formative years.  Id.

Dr. Hatzenbuehler specifically diagnoses Chris with Complex PTSD or C-PTSD.  This disorder includes all of the typical PTSD symptoms (hypervigilance, flashbacks, avoidance) but is marked with prolonged exposure to repeated traumatic events and increased emotional dysregulation (trouble managing sadness and anger), as well as increased negative feelings towards oneself and difficulties with trusting others and maintaining relationships.  Exhibit B, p. 2.

It must be noted that the PTSD Chris developed from the abuse sustained from his stepfather, exacerbated by the trauma experienced during his service in Iraq as a Marine, has produced a concerning suicidal ideation in him.  Chris even checked himself into the VA Emergency Department after prolonged drinking plus increasing depression, caused his roommate to bring him to the hospital and take away his firearm.  Exhibit B, p. 7.

**Sentencing Memorandum -- 12**

According to Dr. Hatzenbuehler, Chris has "several protective factors" which decrease his risk of engaging in illegal behavior in the future. Those include his honorable discharge from the Marines, his strong work ethic, and his bonds with his family members, who have provided him with support and who continue to be actively involved in his life.

Dr. Hatzenbuehler observes based on her communications with Chris's mother that he has had a longtime interest in collecting guns throughout his upbringing. Because his possession of guns in the past has not been linked to malicious intent but rather to collecting them and using them recreationally, Dr. Hatzenbuehler does not believe that he presents a high risk to use a weapon to harm others. Exhibit B, p. 17.

Despite the trauma that Chris has endured and the negative impact of those experiences, Dr. Hatzenbuehler concludes that Chris's PTSD-related symptoms, as well as his symptoms of depression, including suicidal ideation, and substance misuse, may all be improved with treatment. Id. Additionally, Chris has demonstrated insight into his condition that will help him avoid reverting to criminal conduct in the future. That insight has informed his recognition that he needs treatment and has motivated him to seek it out and actively participate in it. Put simply, Chris wants to have a stable and normal life with a healthy relationship with his romantic partner. He is committed to taking whatever steps may be necessary through treatment, medication, and relationship counseling to achieve this goal.

Sentencing Memorandum -- 13

4.    **Strong Network of Support**

Attached to this memorandum are a number of letters weighing in with their positive observations and experiences with Chris.  He is frequently described as a protector – not someone who would ever harm others.  While he has had these various legal problems arising from his tumultuous romantic relationships, he denies all allegations that he has harmed others or has any inclination to do so.  He adamantly denies the allegations in his pending California aggravated assault case, and he intends to take that case to trial as a result.

Chris is also described as a compassionate soul who has always been willing to volunteer his time to help others.  Both his mother and sister describe him as having been "lost" due to the effects of his military service in a combat zone.  They are optimistic, however, that by participating in treatment, the son and brother they have had to watch struggle in these last several years may now be returning to his old self.  Paige writes:

> [O]ver the last year he has spent behind bars, I have spoke with him often and I can clearly hear what I would call the old Christopher shining through.  He seems to have done a lot of reflecting on himself while in custody, and his outlook has done a 180 from how he was a year ago.  I hear him taking responsibility, I hear regret, I hear him making plans for a brighter and better future. … As a little sister I can see through him pretty clearly, and this change is genuine.  I believe that he was lost, and he has slowly found himself again, and I know in my heart that he is ready to become who he has always been deep down; a good and honest man who would do anything for his family and country.

Exhibit E, p. 1.  Chris is extremely motivated to redeem himself and to justify the faith and support his family and close friends have extended to him.

Sentencing Memorandum -- 14

No doubt, spending the last year in custody has been difficult for Chris; however, he has used the time to reflect on what he wants for himself and his loved ones going forward. He fully intends to get the help that he needs and that will be available once he is released so that he never again finds himself on the wrong side of the law. While programming opportunities in county jails are typically minimal, Chris has been taking courses through the Washington County Jail's Edovo platform. A transcript of his completed classes is attached; it demonstrates Chris's desire to take every opportunity to improve himself and defeat his demons. Exhibit F

The defense respectfully requests the Court to impose the proposed sentence of 21 months to recognize the impact of the trauma inflicted on him as a young boy by his abusive stepfather, which then was amplified and compounded by the PTSD he developed during his service in the Marine Corps. These circumstances warrant of what Chris has had to endure and the sacrifices he has made in the protection of our country. "Evidence regarding social background and mental health is significant, as there is a belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems, may be less culpable than defendants who have no such excuse." Landrigan v. Schriro, 441 F.3d 638, 649 (9th Cir. 2006) (quotation omitted), vacated on other grounds, 501 F.3d 1147 (9th Cir. 2007); Karis v. Calderon, 283 F.3d 1117, 1134 (9th Cir. 2002).

Sentencing Memorandum -- 15

B.    **Nature and Circumstances of the Offense**

While the defense appreciates that unlawful firearm possession is serious, Chris' background provides important context to his possession of this large number of weapons. As described above, Chris has historically collected and recreationally used firearms throughout his life. Rather than stockpiling guns for some nefarious purpose, Chris has been drawn to them from an early age for the sense of protection and security he has felt they provide.

This reality undermines the utility of the Sentencing Guidelines as a tool for imposing a reasonable sentence in this case. The Guidelines contain enhancements that increase a defendant's applicable offense level where the firearms unlawfully possessed present a greater degree of danger – either because of the number of guns involved or because they have some aggravating feature such as a lack of serial number.

If the Guidelines increase an individual's offense level and resulting Guideline range when circumstances make the unlawful firearm possession more dangerous, those should be offset by factors that reduce the danger presented by them. In this case, as the defense noted in its Response to Presentence Report, the two unregistered firearms were not operable and could not have been rendered operable absent significant efforts. While they may still qualify as fi rearms for purposes of the statute, the reality is that their condition makes them significantly less dangerous.

Furthermore, while the number of guns possessed by an individual can

enhance the dangerousness of the situation, where, as here, that number has been inflated because the person is a collector of firearms rather than someone intending to use them to commit other crimes, the rationale is reduced or eliminated altogether, which necessarily results in the Guideline range exceeding that which is necessary to accomplish the § 3553 sentencing goals. Where the individual's possession of such a number of weapons can be linked to a fascination that developed because chronic physical abuse perpetrated on the person produced feelings of vulnerability and insecurity, less imprisonment is required to protect society and deter the person from future offenses.

The bottom line is that Chris's history and characteristics provide important mitigating context that weighs heavily against following the advisory Sentencing Guideline range, which abjectly fails to account for the unique circumstances presented in this case. Even the 46–57-month Guideline range stands out as excessive and unfair when Chris's history of trauma beginning when he was just a young child and continuing into adulthood is considered. In the event Chris's rehabilitative efforts falter and he violates his supervision conditions or commits a new offense, the Court will be able to account for his squandering of its leniency by imposing a more punitive term of imprisonment at that time.

Rather than simply incarcerating Chris for the extended time contemplated by the Guidelines, the defense respectfully maintains that requiring him to participate in and complete a treatment program for substance abuse and coping with the effects

**Sentencing Memorandum -- 17**

of trauma as a condition of supervised release makes more sense because it would directly address those problems that Chris developed through no fault of his own.

## C.    Section 3553(a)(2) Factors

The sentence proposed by the defense would strike an appropriate balance between holding Chris accountable for his criminal conduct while recognizing the mitigating factors in his background.  Those mitigating factors reduce the amount of time necessary to satisfy the § 3553 sentencing objectives.

Twenty-one months imprisonment combined with the three years of supervised release will be sufficient to deter Chris from future criminal conduct.  The year he has spent in the jail has already had an enormous impact on him – he has no desire to engage in any conduct that might result in him repeating the process.  Chris also wants to begin his life with his girlfriend, Halei, who has stood by him during this difficult time.  He recognizes that he would be letting those he loves the most down.  Finally, he views himself as having a lot to prove – to his family, his community, the Court, and, perhaps most importantly, himself.

Chris has shown that he has the tenacity and perseverance to serve his country with honor as a Marine in a combat zone.  If he can muster the discipline to handle that hostile scenario, he can conform his conduct to the law and follow the Court's supervision conditions.  Thus, more time is simply unnecessary to satisfy § 3553.

The sentence proposed would promote respect for the law by providing some leniency to a patriotic Marine who lost his way because of the trauma sustained as a

child and then magnified through his experiences in Iraq. However, the sentence proposed would still hold him accountable, and he will still have a felony conviction on his record.

Sometimes it seems the government views increasing the length of an individual's prison sentence to be the only way to promote respect for the law. However, the Supreme Court itself rejected such an approach in Gall v. United States, 552 U.S. 38, 54 (2007), where it cited with approval the district court's observation that "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" The sentence proposed by the defense does take into account the real conduct and circumstances of this case. Given the demands placed on our brave members of the military, granting a downward variance to 21 months imprisonment would likewise still constitute just punishment.

A longer term of imprisonment will not be necessary to protect the public or deter Chris from future criminal conduct given the strong family support he continues to enjoy. Again, the three years of supervised release should factor into this analysis because it will allow the Court to nip any backsliding by Christopher in the bud.

**Sentencing Memorandum -- 19**

## Conclusion

For the reasons stated, which the defense will expound upon at the time of the sentencing hearing, the defense respectfully requests the Court to follow the defense sentencing recommendation.

Date: November 14, 2025          Respectfully submitted,

/s/Thomas Monaghan
Thomas Monaghan
Thomas Monaghan Law, PLLC
Attorney for
CHRISTOPHER MICHAEL HAYMAN

Sentencing Memorandum -- 20

<u>CERTIFCATE OF SERVICE</u>

The undersigned hereby certifies that on November 11, 2025, I caused a true and correct copy of the foregoing Sentencing Memorandum to be served upon the individual/entity named below in the manner so indicated:

Christopher Booker, Assistant United States Attorney
United States Attorney's Office
1290 West Myrtle St
Boise, ID  83702

Caitlyn O'Very
United States Probation Officer
550 W. Fort St.
Boise, Idaho 83702

VIA Email

<u>/s/Thomas Monaghan</u>

**Sentencing Memorandum -- 21**